480 So.2d 363 (1985)
Donald CHELETTE, Plaintiff-Appellee,
v.
AMERICAN GUARANTEE AND LIABILITY INSURANCE, INC., et al., Defendants-Appellants.
No. 84-936.
Court of Appeal of Louisiana, Third Circuit.
December 11, 1985.
Davidson, Meaux, Sonnier & McElligott, Steven M. Jankower, Lafayette, for defendants-appellants.
*364 Felix A. Dejean and Thomas J. Dejean, Opelousas, for plaintiff-appellee.
Before GUIDRY, DOUCET and LABORDE, JJ.
GUIDRY, Judge.
This case concerns a workers' compensation claim under the 1983 statutory revisions. Plaintiff, Donald Chelette, filed suit against American Guarantee and Liability Insurance, Inc. (hereafter referred to as Zurich), and the plaintiff's employer, Scaffold Builders, Inc. (hereafter referred to as SBI), praying for workers' compensation benefits, medical expenses, statutory penalties, and attorney's fees. Before trial, Zurich and the plaintiff settled the compensation benefits and medical expenses claims. After a trial on the merits, the trial court awarded plaintiff judgment against Zurich for penalties in the amount of $1816.68 and attorney's fees in the sum of $5,000.00. The defendant, Zurich, has perfected this suspensive appeal. Plaintiff filed an answer to the appeal requesting additional attorney's fees of $2,500.00 for services of his attorney on appeal.

FACTS
Early in the morning on August 15, 1983, Donald Chelette, after having a breakfast of coffee and toast, left his home in Opelousas and drove to the work site of his new job with SBI. This was his first day on the job. Chelette's job duties included building and tearing down scaffolds at various locations within the Exxon Refinery at Baton Rouge. Work began promptly at 7:30 a.m. Chelette's first assignment, on this hot August morning, was to assist in tearing down a scaffold. The planks of the scaffold were 8 to 10 feet long and weighed approximately 40 pounds each. Roy B. Morton, the job site foreman, and another co-employee handed the planks and scaffolding bars to Chelette, who stood on the ground. Chelette would then load the materials onto a truck. After loading the truck, the three men drove to a different location to unload and stack the scaffolding materials. Chelette testified that this operation took approximately one hour.
The next job assignment consisted of building a tent out of scaffolding material to shade welders from the heat of the sun. Chelette's assignment was to hand-up whatever materials his co-workers needed. At this time, approximately 9:00 or 9:30 a.m., Chelette, according to his testimony, started to experience some physical weakness. About one hour later slight pains started to occur in his chest area. This weakness and pain, however, did not stop Chelette from continuing to perform his job functions until the noon hour.
During lunch, Chelette sat in the shade and drank a soft drink. He did not eat his lunch because of his weakness and somewhat nauseated condition.
At 12:30 p.m. Chelette returned to the tent construction. Between 12:30 p.m. and 1:30 p.m. his condition became more acute. His foreman, Roy Morton, on a later date, reported to the SBI risk manager that Chelette almost passed out a couple of times. By 1:30 p.m. Chelette's condition was so aggravated that he could not continue working. At this time the foreman, Roy Morton, drove Chelette to a small shack where Chalette rested until quitting time. Chelette testified that by quitting time the pain in his chest had subsided enough for him to drive back to his home in Opelousas, however, while driving home, he had to stop three times because of his nauseated condition.
After arriving home, he immediately went to bed because the pain began to increase again. By 5:30 or 6:00 p.m., his pain was so intense that Chelette asked his father to take him to Opelousas General Hospital. Chelette was admitted to the emergency room of the hospital during the evening of August 15, 1983, and later transferred to the intensive care unit.
On August 18, 1983, Opelousas General Hospital, concerned about Chelette's insurance coverage, called SBI to request information concerning whether they provided workers' compensation insurance for Chelette's hospitalization. Ms. James, a representative *365 of Zurich, the insurer of SBI, testified that at that time SBI informed Opelousas General that they could not authorize any payment under their workers' compensation coverage because they were not sure that the claim was compensable.
Sometime between August 15, 1983 and August 25, 1983, Chelette contacted his attorney. His attorney attempted to report the injury to SBI by telephone, however, he was not able to reach the proper SBI representative. Plaintiff's attorney then sent a letter, via certified mail, to SBI, dated August 25, 1983, informing SBI of the severe myocardial infarction (heart attack) suffered by Chelette and requested immediate payment of benefits under SBI's workers' compensation coverage with Zurich. Plaintiff's attorney sent a second letter, via certified mail, to Zurich on September 1, 1983, informing them of the plaintiff's condition and claim.
On September 2, 1983, SBI, apparently concerned about the situation, filed an Employer's Report of Occupational Injury or Disease with the State Office of Workers' Compensation. This report contained a brief report of the August 15th occurrence. The plaintiff filed his claim for workers' compensation with the State Office on September 9, 1983, alleging that the heart attack was work-related. Also, on September 2nd, SBI wrote to Zurich that Chelette indeed was employed by them on August 15th; he had worked very hard that day; he felt ill while working and almost passed out a couple of times; and, he had informed his job foreman of his condition. However, SBI also indicated that they were unsure about whether or not the injury was work-related and felt that the matter required further investigation.
Zurich then commenced its further investigation. Ms. James, the Zurich representative, interviewed Roy Morton, the foreman, on September 14, 1983 and interviewed Chelette on September 20, 1983. Both of these interviews confirmed that Chelette had experienced weakness, nausea, pain, and dizziness while on the job. However, the interviews did not confirm the existence of a heart attack. Zurich also requested medical reports from Opelousas General and Lafayette General Hospitals. In connection with the hospital reports, Zurich requested medical reports and opinions from Chelette's treating physicians, Dr. Bienvenu, an internist, who first saw Chelette when he entered Opelousas General, and Dr. Ducote, a cardiac specialist, who saw Chelette at Opelousas General and at Lafayette General Hospital. These reports were not tendered to Zurich immediately.
In the meantime, on October 8, 1983, the Office of Workers' Compensation, based on the information submitted, advised the parties that the plaintiff's injury was not work-related, and therefore, not subject to payment of workers' compensation benefits. The Office of Workers' Compensation did not have any reports from the hospital or doctors but based their decision solely on information furnished by SBI and the plaintiff.
The plaintiff, after receiving the advisory opinion, rejected the board's recommendation; Zurich, of course, accepted. On October 31, 1983, the Office of Workers' Compensation sent all parties a Certificate of Rejection pursuant to R.S. 23:1310.1. Plaintiff then filed suit on November 2, 1983.
Soon after suit was filed, the hospitals and doctors filled Zurich's medical information request. The reports from Opelousas General and Dr. Bienvenu showed that Chelette had been admitted on August 15, 1983, and that he had suffered both anterior and inferior myocardial infarctions. The reports were inconclusive about whether the attacks occurred on the same day and whether the attacks were work-related. However, at his deposition on a later date, Dr. Bienvenu stated his belief that the heart attack of August 15, 1983 was definitely work-related.
The report from Dr. Ducote, received by Zurich on November 16, 1983, stated that Chelette had an extensive amount of myocardial damage; he was totally and permanently disabled; and, most significantly, that the heart attack was precipitated by *366 the work which Chelette was doing on the day of the attack. Dr. Ducote was the only cardiac specialist consulted by the parties. The defendants never controverted Dr. Ducote's written opinion or his later testimony during deposition.
On January 25, 1984, Zurich entered into a compromise agreement with the plaintiff, agreeing to pay past due compensation and all medical expenses. On February 3, 1984, the parties tried the remaining issues concerning statutory penalties and attorney's fees.
The only issue in this case is whether, under the aforestated circumstances, it was proper for the trial court to award the plaintiff statutory penalties and attorney's fees pursuant to the 1983 revision of the Workers' Compensation Act.

STATUTORY PENALTIES
The trial court awarded the plaintiff $563.04, representing 12% statutory penalties on the compensation benefits of $4,692.00 paid on February 3, 1984, and $1,253.64, representing 12% statutory penalties on the medical bills in the amount of $10,447.03 plus legal interest from date of judicial demand on both amounts, until paid. The appellant contends that this was error.
The 1983 revision of the Workers' Compensation Act, and in particular, R.S. 23:1201(B, E) provides, in pertinent part:
"B. The first installment of compensation payable for, ..., permanent total disability, ... shall become due on the fourteenth day after the employer has knowledge of the injury ... and resulting loss of income, on which date all such compensation then due shall be paid.
E. If any installment of compensation payable without an order is not paid within the time period provided in Subsections (B), ... of this Section, there shall be added to such unpaid installment a penalty of an amount equal to twelve percent thereof, which shall be paid at the same time as, and in addition to, such installment of compensation, unless such nonpayment results from conditions over which the employer or insurer had no control. Whenever the employee's right to such benefits has been reasonably controverted by the employer or his insurer, the penalties set forth in this Subsection shall not apply ..." (Emphasis supplied).
Previous to Acts 1983, 1st Ex.Sess., No. 1, § 1, the standard employed to determine whether a claimant was entitled to statutory penalties was whether the failure to pay could be said to be arbitrary, capricious or without probable cause. That standard was changed with the 1983 revisions. Under the new workers' compensation provisions, the employer and/or insurer escapes the payment of statutory penalties if non-payment results from conditions over which the employer or insurer had no control, or if the latter can "reasonably controvert" the employee's right to medical and compensation benefits. If non-payment did not result from conditions over which the employer or insurer had no control or if the employer or insurer is not able to reasonably controvert the employee's right to such benefits, then penalties attach if payment of said benefits does not take place by the fourteenth day after the employer or his insurer had knowledge of the compensable injury. The provisions of La.R.S. 22:658 are no longer applicable to claims arising under our worker's compensation law. See La.R.S. 23:1201.2.
Zurich does not contend that non-payment to plaintiff resulted from conditions over which it had no control. We must next determine whether the defendant has established its right to "reasonably controvert" plaintiff's entitlement to benefits under the worker's compensation law.
The reasonably controverted test has never before been subjected to appellate interpretation. Since it is a new test, we cannot rely upon prior jurisprudence which used the arbitrary, capricious or without probable cause standard.
Black's Law Dictionary 298 (5th ed. 1979) defines "controvert" as "to dispute; *367 to deny; to oppose or contest; to take issue on." Using this definition along with a plain reading of the statute, we conclude that the following test is applicable: given the facts, medical and otherwise, known to the employer or his insurer, did the employer or insurer have a reasonable basis to believe that medical expenses and compensation benefits were not due the employee. Stated another way, did the employer or his insurer have sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. This test requires a close analysis of each workers' compensation case.
In the present case, the trial judge, in his written reasons, accurately set forth the knowledge of Zurich. Prior to November 16, 1983, the information furnished by plaintiff and that generated by Zurich's investigation was somewhat equivocal such as to justify a reasonable belief that medical expenses and compensation benefits were not due. Zurich had little medical facts to base its decision on prior to this date, and the Office of Worker's Compensation had issued a certificate of rejection. However, on November 16, 1983, Zurich received the medical opinion of Dr. Ducote, the only cardiac specialist relied upon by either party. Dr. Ducote's letter succinctly and positively concluded that Chelette had suffered a heart attack on August 15, 1983, and that the heart attack was precipitated by the work which Chelette was doing on the day of the attack. At this point, we conclude Zurich had every reason to believe that medical and compensation benefits were due Chelette. In fact, most of the facts gathered from lay and medical people before the Ducote letter could, after receipt of the Ducote letter, be easily seen as supporting Dr. Ducote's analysis. Zurich could not rely upon the recommendation of the Office of Workers' Compensation because such recommendation was advisory only. LSA-R.S. 23:1310.1(A). Even Dr. Bienvenu, during his later deposition, stated that his report to Zurich, which Zurich had received before the report from Dr. Ducote, had affirmatively indicated that Chelette had suffered a heart attack on August 15, 1983.
Zurich had fourteen days from the date it received Dr. Ducote's letter to either pay the medical expenses and compensation benefits or diligently make further investigation of the facts, medical and otherwise, seeking to confirm or controvert the opinion advanced by Dr. Ducote. Zurich did not pay the benefits within the time limit and did not further seek evidence, medical or otherwise, to reasonably controvert the plaintiff's claim. Thus, we conclude, as did the trial judge, that Zurich owes the 12% statutory penalty on the medical expenses and compensation benefits due Chelette.[1]

ATTORNEY'S FEES
The appellants contend that the trial court erred in awarding the appellee $5,000.00 in attorney's fees, with legal interest from date of judicial demand, until paid.
The 1983 revision of R.S. 23:1201.2 provides in pertinent part:
"Any insurer liable for claims arising under this Chapter, ..., shall pay the amount of any claim due under this Chapter within sixty days after receipt of written notice. Failure to make such payment within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject employer or insurer, in addition to the amount of the claim due, to payment of all reasonable attorney's fees for the prosecution and collection of such claim, ... The provisions of R.S. 23:1141 limiting the amount of attorney's fees shall not apply to cases where the employer or insurer is found liable for attorney's fees under this Section. The provisions of R.S. 22:658 shall *368 not be applicable to claims arising under this Chapter."
This revision, unlike the statutory penalties section, retained the same standard as the repealed statute for the imposition of attorney's fees. Attorney's fees are imposed if the insurer is found to be arbitrary, capricious, or without probable cause in its failure to pay a claim within 60 days after receipt of written notice of same.
Because the legislature retained the same standard for the imposition of attorney's fees, we are able to use judicial interpretations of the repealed statute in our present determination. We first note that, absent clear error, the trial court's decision on this question of fact will not be disturbed. Williams v. Western Preferred Cas. Ins. Co., 465 So.2d 191 (La.App. 3rd Cir.1985); Odom v. Dixie Tie and Timber Co., 458 So.2d 561 (La.App. 3rd Cir.1984).
In determining whether an insurer was arbitrary, capricious, or without probable cause, the courts, in the past, have refused to award attorney's fees where there has been a bona fide factual dispute as to whether the employee's disability was work-related. Lonzo v. Town of Marksville, 430 So.2d 1088 (La.App. 3rd Cir.1983), writ denied, 438 So.2d 573, 576.
In the present case, all bona fide factual disputes were put to rest when Zurich received the letter from Dr. Ducote on November 16, 1983. All of the information that Zurich had received previous to Dr. Ducote's letter added strength to Dr. Ducote's conclusions. At that time, the circumstances were such that Zurich should have diligently made further investigation into the facts, medical and otherwise, or made payment to plaintiff. It did neither.
Zurich had sixty days from November 16, 1983 to pay the benefits claimed to avoid imposition of attorney's fees. Zurich's payment came after the sixty day time limit. We, thus, conclude that the trial court was correct in assessing attorney's fees against Zurich.

ATTORNEY'S FEES ON APPEAL
Appellee contends that an additional $2,500.00 should be assessed against the defendants for services of his attorney on appeal.
We find that an additional award of attorney's fees in the amount of $750.00, in favor of the plaintiff and against the defendant, is reasonable.
For the foregoing reasons, the judgment of the trial court is amended so as to increase the award of attorney's fees to the sum of $5,750.00. In all other respects, the judgment of the trial court is affirmed. Defendant-appellant is cast with the costs of this appeal.
AMENDED AND AFFIRMED.
LABORDE, J., concurs in the result and would increase the attorneys' fee on appeal.
NOTES
[1] The 12% additional payment is, under the facts of this case, assessable only against Zurich. See La.R.S. 23:1201(E).